

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

|  |  |  |
|---|---|---|
| GREGORY ALLEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No: 07 C 5214 |
| v. | ) | |
| | ) | Magistrate Judge Jeffrey Cole |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

The plaintiff, Gregory Allen, seeks review of the final decision of the Commissioner ("Commissioner") of the Social Security Administration ("Agency") denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 423(d)(2), and Supplemental Security Income ("SSI") under Title XVI of the Act, 42 U.S.C. § 1382c(a)(3)(A). Mr. Allen asks the court to reverse and remand the Commissioner's decision, while the Commissioner seeks an order affirming the decision.

### I.
### PROCEDURAL HISTORY

Mr. Allen applied for DIB and SSI on August 29, 2002, alleging that he had been disabled since August 31, 2000, due to bipolar disorder. (Administrative Record ("R.") 22, 127-129, 145). His application was denied initially and upon reconsideration. (R. 29-40). Mr. Allen continued pursuit of his claim by filing a timely request for hearing on June 19, 2003. (R. 41).

An administrative law judge ("ALJ") convened a hearing on July 13, 2004, at which

Mr. Allen, represented by counsel, appeared and testified. (R. 592-633). In addition, Dr. Daniel Schiff testified as a medical expert, and Susan Entenberg testified as a vocational expert. (R. 592, 595-603, 626-32). On September 21, 2004, the ALJ issued a decision finding Mr. Allen disabled from August 31, 2000, to March 3, 2004. As of that date, the ALJ found that Mr. Allen could perform a limited range of low stress, sedentary work, as long as it involved no more than limited contact with co-workers or the general public. (R. 27-28). This became the final decision of the Commissioner when the Appeals Council denied Mr. Allen's request for review of the decision on June 13, 2007. (R. 5-7). *See* 20 C.F.R. §§ 404.955; 404.981. Mr. Allen has appealed that decision to the federal district court under 42 U.S.C. § 405(g), and the parties have consented to the jurisdiction of a Magistrate Judge pursuant to 28 U.S.C. § 636(c).

## II.
## EVIDENCE OF RECORD

### A.
### Vocational Evidence

Mr. Allen was born on August 13, 1959, making him forty-five years old at the time of the ALJ's decision. (R. 127). He has a tenth-grade education, and took special education classes for two or three years. (R. 151). He has a spotty employment history, working for six different employers from 1985 through 1987, and perhaps fifteen different employers from 1992 through 2002. (R. 130-133). He was incarcerated for nearly two years in the 1980s, having been convicted for robbery; he was stealing to get money for drugs. (R. 186).

### B.
### Medical Evidence

Mr. Allen has a long history of psychological problems – and family problems. He

2

relates rather harrowing childhood experiences, including his mother shooting his stepfather, and his stepfather setting their house on fire. (R. 294, 350). They are deceased, along with all but one of Mr. Allen's siblings, who is in jail for murder. (R. 350). Also, Mr. Allen reports being sexually abused by an aunt when he was a child. (R. 350).

Following his incarceration for robbery, Mr. Allen had outpatient treatment for his substance abuse problem and was sober for five years. (R. 186). He was hospitalized following a suicide attempt in 1990, when he cut his wrists with an ax. (R. 223, 293, 347, 365). He cannot remember what prompted him to do that. (R. 608). In late 1998, his father and his aunt died, and in April of 1999, Mr. Allen lost his mother. (R. 185). He relapsed and began using cocaine, marijuana, and alcohol. (R. 182, 185). He overdosed on Doxepin and cocaine, which caused respiratory failure. (R 191, 608-09). He was hospitalized in the intensive care unit of St. Francis Hospital for the suicide attempt and major depression. (R 191-97). After three days he was stable and denied further suicidal ideation. (R. 191). Mr. Allen was discharged and transferred to the psychiatric facility at Christ Hospital, and then moved to Hartgrove Hospital where he was treated for posttraumatic stress disorder and polysubstance abuse. (R 182-87).

After Hartgrove, Mr. Allen entered a residential substance abuse treatment program at Gateway. (R. 183-84, 187). Once he completed the program, Mr. Gregory received treatment as an outpatient from September 1999 through December 2002, at Alexian Brothers Northwest Mental Health Center for bipolar disorder and substance dependence. (R. 216-18, 364-84). Treatment notes from this period are generally illegible – neither party attempts to decipher them – but it would appear that Mr. Allen was prescribed Depakote and Seroquel – for bipolar disorder – and Serzone and Welbutrin – both anti-depressants. (R.

3

364, 369, 370, 373- 376, 383-84).

The Agency arranged for Mr. Allen to be evaluated by a psychiatrist, Dr. Kiran Frey on February 5, 2003. At that time, Mr. Allen had lost his driver's license due to a DUI. (R. 223). His wife accompanied him to the examination, and she provided 30-40% of Mr. Allen's psychiatric history. (R. 223). He did not work hard to retrieve answers. He had an attitude "where he did not really care about the psychiatric examination." (R. 223). He did not take care of his hygiene; he did not shave or bathe. (R. 223). He admitted he was drinking off and on. (R. 223). He said he did little around the house, and his wife took care of his son from a previous relationship. Mr. Allen remained in bed until noon most days. (R. 224).

Mr. Allen was depressed, helpless, hopeless, and "suicidal but with no immediate desire to hurt himself . . . He wanted something to happen to him." (R. 224). He did not care who the past few presidents were and could not name five large cities. (R. 224). Abstract thinking was fine, and judgment was intact. (R. 225). Dr. Frey diagnosed bipolar disorder and chronic alcoholism and concluded that plaintiff was seriously ill with a guarded prognosis and was in dire need of treatment. (R 225). The doctor felt Mr. Allen's functioning was reduced 60%. (R. 225). He had a considerable degree of rage and withdrawn behavior, and would be unable to manage his own funds if granted benefits. (R. 225).

On February 18, 2003, Kirk Boyenga, a Ph.D., reviewed Mr. Allen's medical file for the Agency. He found him to be moderately limited in his ability to carry out detailed instructions, maintain attention and concentration for extended periods, complete a normal workday without interruptions from psychologically-based symptoms, interact appropriately

4

with the general public, and respond to changes in a work setting. (R. 241). He felt Mr. Allen's psychological problem were secondary to his substance addiction. (R. 242).

In October 2003, Mr. Allen again attempted suicide, this time by overdosing on prescription medications, and was hospitalized at Provena St. Joseph Hospital. (R. 268-73, 334, 347). This attempt was precipitated by problems with his wife and an altercation with his nephew, who was living with Mr. Allen and his wife. (R. 347). Mr. Allen was drinking the night of the incident. (R. 506). The police were called, Mr. Allen was charged with domestic abuse, and the nephew and a younger niece were removed by DCFS. (R. 347). Mr. Allen had taken them in after the death of his sister. (R. 350). Upon admission to the hospital, he traced his depression to his wife and stress from the children. (R. 292-94). He said he had a "pretty long" rap sheet, and had been arrested several times for robbery or burglary. (R. 295). He added that "he was in the psych. hospital for 2 years while in the penitentiary for trying to chop his wrist off with an axe." (R. 293). He related his family history, and was treated for bipolar disorder. (AR 268-73).

Upon psychiatric evaluation by Dr. Syed Anwar, Mr. Allen's mood was very depressed; he was agitated, anxious, and nervous. (R. 272). He was unstable, and his insight and judgment were limited. (R. 272). He exhibited some flight of ideas. (R. 273). Dr. Anwar assigned Mr. Allen a Global Assessment of Functioning score of 25. (R. 292).[1]

---

[1] The Global Assessment of Functioning or "GAF" assigns a numerical score on a 100-point scale to a "clinician's assessment of the individual's overall level of functioning." American Psychiatric Association, *Diagnostic & Statistical Manual of Mental Disorders*, 32 (4th ed., Text Revision, 2000)). A GAF score of 21-30 indicates that a person's behavior "is considerably influenced by delusions or hallucinations or serious impairment in communication or judgment ... or inability to function in almost all areas." A score of 41-50 indicates serious symptoms or any serious impairment in social or occupational functioning. A score of 51-60 indicates moderate symptoms or moderate difficulty in social or occupational functioning. *Id.*, at 34.

Upon release from St. Joseph, Mr. Allen was referred to Dr. Robert Kravets, a psychiatrist, for outpatient care of bipolar disorder and substance abuse. (R 271). Upon initial evaluation on October 27, 2003, Dr. Kravets found Mr. Allen's affect mildly depressed. (R. 347). The doctor noted no gross thought disorder, and described Mr. Allen as passive and cooperative. (R. 347). He planned a course of treatment including AA meetings and individual therapy sessions, continued Mr. Allen on Depakote, and added prescriptions for antidepressants Effexor and Trazodone. (R. 348). The doctor assigned a GAF score of 48. (R. 347). In November, the clinician who would be following Mr. Allen assigned him a GAF score of 55 upon her initial evaluation. (R. 347).

Therapy sessions appear to have begun in late 2003, and opened by identifying Mr Allen's central problem: his wife. (R. 414). As is often the case, session notes provide little insight into Mr. Allen's ability to work – such notes are not designed for that purpose after all. But they make up a large percentage of the record in cases like these. So, on December 17, 2003, the clinician recounted an hour with Mr. Allen as follows:

> The client was seen for an individual session lasting one hour. The client was assisted with processing issues related to the holidays. This therapist indicated that it is important to have realistic expectations regarding the holidays. Most likely, things will resume to their former level in his marriage after the holidays.

(R. 402). After the holidays, Mr. Allen reported that he was planning on taking positive steps in the new year, such as giving up smoking and eating healthily and exercising. (R. 401).

On January 21, 2004, Mr. Allen reported that he was working on managing his anger and setting boundaries in his life. This was in reference to his nephew, whom he decided not to take back into his home due to the disruption he caused. (R. 400). At his next

6

appointment on February 2nd, however, the topic was continued frustration and tension in his marriage. Mr. Allen was going to AA meetings in the hopes he would not relapse. (R. 399). Mr. Allen also had a session with Dr. Kravets that day. He described his wife as stubborn, controlling, and manipulative. (R. 411). He was under much stress. Mr. Allen expressed no suicidal or homicidal thoughts or plans, and was in good contact with reality, although he was mildly depressed and anxious. Dr. Kravets adjusted Mr. Allen's medications due to some side effects, lowering his dosage of Trazodone, while adding a prescription for Seroquel. (R. 411).

On February 25, 2004, the topic moved from Mr. Allen's wife to his nephew. His nephew accused him of using his Social Security money to purchase a home computer. Mr. Allen indicated that he and his wife were planning on giving up guardianship of his niece and nephew due to the stress they had caused in their lives – a reiteration of his plan from a month earlier. (R. 397). Mr. Allen was described as "upset," but able to "appropriately express[] his concerns . . . ." (R. 397).

On March 3, 2004, Mr. Allen discussed his grief over the death of his aunt. He was managing his emotions and anger better than he had in the past. (R. 396). He reported continuing problems with his wife on March 17th. (R. 395). In his April 5, 2004 session, Mr. Allen described his frustration with his marriage: he hoped to leave his wife as soon as he could support himself. She was argumentative and refused to be involved with his therapy. (R. 394). He also met with Dr. Kravets that day. The doctor said he was "getting along better . . . less depressed . . . still mildly depressed over conflicts with his girlfriend." (R. 411). His mood and behavior were adaptive. (R. 411).

On April 28, 2004, Mr. Allen reported he was having "negative thoughts" and was

sleeping in the daytime. (R. 394). On May 12th, Mr. Allen discussed his desire to obtain a hardship driver's license so he could look for work. He was working on getting up in the morning, and scheduling things during his days. He was attending AA meetings. (R. 393). A week later, however, he was still struggling with getting out of bed. (R. 534). More family problems were the topic on June 9th, as Mr. Allen admitted to continuing difficulty managing his anger:

> [Mr. Allen] recently had an argument with his wife's son. He reported that the argument did not get physically aggressive. He reported he did not hit her son. His wife accused him of hitting her in order to get the police involved. She later recanted her story. [Mr. Allen] expressed an interest in anger management.

(R. 533). Mr. Allen's anger management continued to be a topic on June 23, 2004; he had a court date that day regarding allegations that he hit his nephew. (R. 532).

On July 19, 2004, Dr. Kravets reported that Mr. Allen had difficulty concentrating and attending to tasks. He could not remember things and was not punctual. (R. 428). He would not be able to get along with supervisors or peers on a job. (R. 428). He was easy to anger and had no tolerance for stress. (R. 428). At that point, Dr. Kravets had Mr. Allen on four doses of 500mg of Depakote daily, along with 75mg of Effexor, 50mg of Trazodone, and 25mg of Seroquel. (R. 428).

On July 27th, Dr. Kravets completed a report for Mr. Allen's counsel in which he indicated that Mr. Allen either could not meet competitive standards, or had no useful ability to function in the following areas: remembering, understanding, and carrying out simple instructions; maintaining attention, attendance, and a regular routine; making simple work-related decisions; completing a workday without interruption from psychologically based symptoms and perform at a consistent pace; responding appropriately to supervision and get

8

a long with co-workers; asking simple questions; responding appropriately to changes in the work setting and deal with normal work stress; interacting appropriately with the public and maintaining socially appropriate behavior; traveling in unfamiliar places and using public transportation. (R. 418-19). In other words, Dr. Kravets said Mr. Allen was disabled.

In August, Mr. Allen continued to discuss his plans for a divorce. (R. 505, 528). He learned the results of the domestic abuse charges leveled against him: he was sentenced to 60 days, but felt he would serve only 30 based on good behavior. (R. 506). The ALJ issued his decision on September 21, 2004, while Mr. Allen was incarcerated. (R. 504).

## C.
## Administrative Hearing Testimony

### 1.
### Plaintiff's Testimony

At the hearing, Mr. Allen testified that he lives with his wife and eleven-year-old son. (R. 603). He took in his sister's three children for a period following her death, but the oldest moved out and DCFS has taken away the other two. (R. 603). Mr. Allen said he is depressed and sad, and his thoughts race uncontrollably, limiting his concentration. (R. 604, 609-10). At times, these thoughts are of homicide and suicide. (R. 604). He stays in bed a lot to avoid thinking about these things. (R 604, 609). He also stays in bed when he feels depressed. (R. 610). Mr. Allen estimated that he might stay in bed, other than eating or showering, three days a week, including all weekend. (R. 604-05). It seemed as though Mr. Allen takes to his bed on the weekends to avoid his wife, who is at work during the week. (R. 617-18, 620).

Mr. Allen has appointments once a week with his therapist, Ms. Burkey, but

9

sometimes did not make it due to transportation issues[2], or schedule changes. (R 606). He also sees Dr. Kravets every one or two months and tries to attend AA meetings daily but some days he doesn't attend them because he feels depressed; "just not in the mood to do nothing." (R. 606-07). Mr. Allen doesn't go out to socialize. At most, he talks on the phone to a friend every three or four months. (R. 610). The only chore he does around the house is folding laundry sometimes, because he doesn't feel like doing anything else (R. 607-08). He exercised at the YMCA, but only for a couple of months. (R. 607). He does not like to read, and cannot really pay attention to TV. (R. 615).

Mr. Allen recounted how, in the early 1990s, he was diagnosed with depression. He attempted suicide by chopping his wrist with an ax, but he doesn't remember why he did it. (R. 608). He said he overdosed on pills and alcohol when his mother died in 1999. (R. 608-09). Then in October of 2003, he became very depressed over the situation with his nephew, because he was trying to do something good, taking in his sister's children after her death, but it "backfire[d] in [his] face." (R. 609). Mr. Allen's medications help him sleep now, but there was a long period when he was not sleeping at all. (R. 610-11). He said his depression has not decreased over the last six months, but his medications have helped with his mood swings. (R. 613). Now he gets headaches that come and go daily; they are relieved by sleeping, but return when he gets frustrated. (R. 609, 611-12). Mr. Allen admits that he gets loud, upset, and angry when someone does not comprehend what he is saying,

---

[2] Mr. Allen – without a driver's license or much in the way of disposable income – obviously had transportation issues getting to his therapy session in Libertyville, Illinois, from his home in Lake Zurich, Illinois. (R. 392). There is a subsidized, state transit service for medicaid patients, but the record reveals that there may have been problems with referrals, vouchers, and scheduling. (R. 392, 394, 395, 399, 400, 401, 457, 460). That is not to say that *every* session Mr. Allen missed was due to such issues.

and that he can be verbally threatening. (R. 614).

Mr. Allen had surgery on his right knee in October of 2003. He said that his knee was improving, and he thought he could stand on it for about four hours. (R. 612-13). He last worked on a full-time basis for two-and-a-half months during the summer of 2003 as a mover, but his knee began to swell up, and he had trouble standing on his feet and walking up and down stairs. (R. 615-17). He thought this would preclude him from returning to that job now as well. In addition, he missed days of work because he just didn't feel like going. (R. 619). And, even when he went to work, he was just not functioning right – his mind was always somewhere else. (R. 617). Mr. Allen explained that, while working at past jobs, he would "drift off at times" and "work would back." He said that, as a mover, he stumbled quite a bit because he was "not paying close attention to what [he] was doing," (R. 617).

Mr. Allen testified that he no longer has a driver's license because it was revoked due to a DUI. (R. 618). He said he has been free of drugs and alcohol since October 2003. (R. 619). Mr. Allen did not think he could hold down a job because he could not make it to work every day; he would probably miss more than one day of work per week. (R. 619).

## 2.
## Medical Expert's Testimony

The hearing actually began with the medical expert, psychiatrist Daniel Schiff, reviewing Mr. Allen's medical record. He said it revealed two consistent problems: depression or bipolar disorder and substance abuse. (R. 596). Alcohol or drugs contributed to plaintiffs hospitalizations in both the spring of 1999, and October 2003. (R. 596-97). He found Dr. Frey's method of rating the level of Mr. Allen's impairment – a 60% reduction in functioning – to be a "very individual way" of doing so. No one else uses percentages

11

like that, according to Dr. Schiff, and so he was not sure what Dr. Frey meant. (R. 597). He also said that times when Mr. Allen indicated he was depressed, it correlated with times he was drinking or did not take his medication. (R. 598).

Dr. Schiff then moved on to Dr. Kravets, Mr. Allen's treating psychiatrist. He noted that he diagnosed Mr. Allen with bipolar disorder and substance abuse. (R. 598). He found Dr. Kravets's assignment of a GAF score of 48 did not correlate with a finding of mild depression. (R. 598). Dr. Schiff pointed to progress notes from February 2, 2004 – stating Mr. Allen was mildly anxious and depressed – April 2004 – stating that Mr. Allen was getting along better, less depressed – and May 12, 2004 – stating that he seemed to be okay and wanted to go to work. (R. 598). Dr. Schiff also drew a distinction between depression in reaction to an event, like Mr. Allen's personal life, and innate depression – what was once called "endogenous" depression. (R. 599, 602). In fact, the doctor seemed to suggest that Mr. Allen was reacting normally to the events in his life:

> what I am hearing about the trouble between himself and his significant other, there is reason for him to be angry. There is reason for him to be saddened. It ain't going well.

(R. 603). Dr. Schiff also was not entirely convinced that Mr. Allen was bipolar; he suspected he was simply depressed because there was no indication of any mania. (R. 601).

After listening to Mr. Allen testify, Dr. Schiff said if his testimony were credited, Mr. Allen was not as functional as his treating psychiatrist thought. (R. 620). Dr. Schiff was impressed with how significantly withdrawn Mr. Allen was. (R. 621). This was a symptom of depression, as was lack of motivation – which could also be a medication side effect. (R. 624). He contrasted that with reports from his "treater," especially on from May 12, 2004 – the last one in the file at the time, which he read to the ALJ:

12

The Client was seen for an individual session lasting one full hour and the client wants to work on obtaining hardship license so that he can work.

(R. 621). Dr. Schiff thought that indicated that "there was some though[t] that he is able to do this." (R. 621). He said Mr. Allen's "treater thinks he is functional. His treater thinks he is mild." (R. 621).

When the ALJ asked Dr. Schiff whether Mr. Allen suffered from any mental illness, Dr. Schiff said that Mr. Allen was on a high dose of mood stabilizer and a modest dose of anti-depressant. This led him to believe that Mr. Allen's therapist thought his depression was adequately treated. (R. 622). Dr. Schiff remarked that Mr. Allen had never been hospitalized when substance abuse was not involved, and that since he had been off drugs and alcohol, "he [had not] been so troubled that he wound up in a mental hospital . . . ." (R. 622-23). Dr. Schiff opined that Mr. Allen did better when he was abstinent; drugs and alcohol "had an affect on his ability to control his behavior and keep himself safe." (R. 623). When Mr. Allen's counsel asked the doctor whether it might be a case of Mr. Allen self-medicating with alcohol or drugs, Dr. Schiff said that was a way many people explained their usage. (R. 626).

### 3.
### Vocational Expert's Testimony

Susan Entenberg then testified as a vocational expert. She said that Mr. Allen's past relevant work ranged from light to heavy in terms of exertional demands, and from unskilled to semi-skilled. (R. 626-28). The ALJ asked Ms. Entenberg to consider a hypothetical individual who was a forty-four-year-old male with a 10th grade education, and who was limited to low stress, sedentary work that involved only limited contact with co-workers and the public because of an affective mood disorder. (R. 628). Ms. Entenberg indicated that

13

such a person could perform work as an assembler (with 4000 jobs in the nine-county Chicago metropolitan area), packer (2000 jobs) and inspector (1000 jobs). (R. 628). In such work, a tolerable rate of absenteeism would be one or two times per month, and if a person could not concentrate two hours at a time one day per week, he would not be able to sustain employment in those positions. (R. 629). The moderate limitations the Agency reviewer found on February 18, 2003 (R. 240-41) would not prevent the performance of the foregoing types of jobs. (R. 630-31). But if a person needed thirty minutes of unscheduled time off a job each day because of an inability to focus or concentrate, that such employment would be precluded. (R. 631-32).

## D.
## ALJ's Decision

The ALJ found that Mr. Allen suffered from bipolar disorder and substance abuse disorder in remission. (R. 22). These were both severe impairments as defined by the regulations. (R. 22, 27). The ALJ further found that, from August 31, 2000, into March 2004, Mr. Allen's disorder met the criteria of the Listing of Impairments § 12.04, covering affective disorders. During this period, he manifested marked difficulties in social functioning and concentration, persistence, and pace. (R. 22-23). Thereafter, however, the ALJ determined that Mr. Allen's condition improved medically, and as of March 3, 2004, he no longer met the criteria of listing 12.04. (R. 23-25). The ALJ noted that at that time, there were notes in the record from Mr. Allen's therapist indicating he was managing his emotions better on March 3, 2004, and was only mildly depressed and expressing a desire to get a job on April 5, 2004. (R. 23).

In fact, the ALJ found that by that time, Mr. Allen had improved to the degree that

14

he was capable of performing work that did not require lifting more than ten pounds; standing and/or walking more than two hours during an eight-hour workday; working in environments conducive to more than low levels of stress; and requiring more than limited contact with coworkers or the general public. (R. 23). The ALJ explained that the medical expert had testified that Mr. Allen's depression was mild, and his mood swings were simply episodes brought on by conflict in his personal relationships. (R. 25). He pointed to treatment notes indicating Mr. Allen had made steady progress since his suicide attempt in October 2003, and that despite his complaints of racing thoughts, suicidal and homicidal ideation, and trouble concentrating, his therapist found him quite functional. (R. 25). The ALJ also noted that Mr. Allen failed to tell his therapist that he skipped AA meetings, which called his credibility into question. (R. 25). And, the ALJ noted, Mr. Allen testified that he had to find work that was physically less demanding than the moving job he held for part of the summer of 2003. (R. 25). Furthermore, Dr. Schiff testified that Mr. Allen functions better when he is sober; he has been so since October 2003. (R. 25).

The ALJ rejected the statement of Mr. Allen's treating psychiatrist that he was disabled as "so far from the truth in this matter as evidenced by claimant's own testimony and the medical records . . . that the conclusions made by Dr. Kravets are given no evidentiary weight whatsoever." (R. 26). In this regard the ALJ noted that the medical expert testified that Dr. Kravets's opinion conflicted with notes where he found Mr. Allen only mildly depressed and cognitively intact. (R. 26). Dr. Schiff described Mr. Allen's problem as not a mental illness, but a problem dealing with a difficult spouse. (R. 26). And he was impressed by the fact that Mr. Allen's therapist found him functional. (R. 26). Finally, the ALJ said the evidence was substantial that Mr. Allen's moving job ended

15

because of physical, as opposed to psychological difficulties. (R. 26). In the end, the ALJ found that, from the beginning of March 2004 through the date of his decision, Mr. Allen could not perform his past relevant work but was able to perform other jobs that existed in significant numbers in the national economy. (R. 26-28). Accordingly, he found Mr. Allen not disabled as of that date. (Tr. 27-28).

# IV.
# DISCUSSION

## A.
## Standard of Review

The applicable standard of review of the Commissioner's decision is a familiar one. The court must affirm the decision if it is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. *Berger v. Astrue*, 516 F.3d 539, 544 (7th Cir. 2008), *citing Richardson v. Perales*, 402 U.S. 389, 401 (1971). The court may not reweigh the evidence, or substitute its judgment for that of the Social Security Administration. *Berger*, 516 F.3d at 544; *Binion on Behalf of Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997). Where conflicting evidence would allow reasonable minds to differ as to whether the plaintiff is disabled, the Commissioner has the responsibility for resolving those conflicts. *Binion*, 108 F.3d at 782. Conclusions of law are not entitled to such deference, however, so where the Commissioner commits an error of law, the court must reverse the decision regardless of the volume of evidence supporting the factual findings. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007).

While the standard of review is deferential, the court cannot act as a mere "rubber stamp" for the Commissioner's decision. *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir.

16

2002). In order for the court to affirm a denial of benefits, the ALJ must "minimally articulate" the reasons for her decision. *Berger*, 516 F.3d at 544; *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). This means that the ALJ "must build an accurate and logical bridge from [the] evidence to [the] conclusion." *Dixon*, 270 F.3d at 1176; *Giles ex rel. Giles v. Astrue*, 483 F.3d 483, 486 (7th Cir. 2007). Although the ALJ need not address every piece of evidence, the ALJ cannot limit his discussion to only that evidence that supports his ultimate conclusion. *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ's decision must allow the court to assess the validity of his findings and afford the plaintiff a meaningful judicial review. *Scott*, 297 F.3d at 595. In other words, as with any well-reasoned decision, the ALJ must rest a denial of benefits on adequate evidence contained in the record and must explain why contrary evidence does not persuade. *Berger*, 516 F.3d at 544; *Eichstadt v. Astrue*, 534 F.3d 663, 665-66 (7th Cir. 2008).

## B.
## Five-Step Sequential Analysis

Section 423(d)(1) defines "disability" as an: "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." *Heckler v. Day*, 467 U.S. 104, 107 n.1 (1984); *Skinner v. Astrue*, 478 F.3d 836, 844 (7th Cir. 2007). The Social Security Regulations provide a five-step sequential inquiry to determine whether a plaintiff is disabled:

1) is the plaintiff currently unemployed;

2) does the plaintiff have a severe impairment;

17

3) does the plaintiff have an impairment that meets or equals one of the impairments listed as disabling in the Commissioner's regulations;

4) is the plaintiff unable to perform his past relevant work; and

5) is the plaintiff is unable to perform any other work in the national economy.

20 C.F.R. §§ 404.1520; *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351-52 (7th Cir. 2005); *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004). An affirmative answer leads either to the next step or, on steps 3 and 5, to a finding that the plaintiff is disabled. 20 C.F.R. §416.920; *Briscoe*, 425 F.3d at 352; *Stein v. Sullivan*, 892 F.2d 43, 44 (7th Cir. 1989). A negative answer at any point, other than step 3, stops the inquiry and leads to a determination that the plaintiff is not disabled. 20 C.F.R. §404.1520; *Stein*, 892 F.2d at 44. The plaintiff bears the burden of proof through step four; if it is met, the burden shifts to the Commissioner at step five. *Briscoe*, 425 F.3d at 352.

## C.
## Analysis

In this case, the ALJ found that Mr. Allen was disabled at step three, but only until March 3, 2004. At that point, the ALJ determined that Mr. Allen's bipolar disorder/substance abuse disorder had medically improved to the point where he could perform a limited range of sedentary work. The ALJ's decision must be supported by substantial evidence which demonstrates that there has been medical improvement in Mr. Allen's impairment and that he is now able to engage in substantial gainful activity. 42 U.S.C. § 423(f). The Social Security regulations define medical improvement as "any decrease in the medical severity of [the claimant's] impairments which [were] present at the time of the most recent medical decision that [the claimant] was disabled." 20 C.F.R. §

404.1594(b)(1); *see Jones v. Shalala*, 10 F.3d 522, 524 (7th Cir. 1993). The question here is what convinced the ALJ that Mr. Allen was no longer disabled in March of 2004. Not much, as it turns out – at least not much that the ALJ articulates in his decision.

1.

Leading up to the date the ALJ selected, the evidence the ALJ discussed was rather dismal. In February 2003, medications were helping Mr. Allen, and he was still drinking on and on – despite attending AA meetings – because it calmed him down. (R. 23). To the examining psychiatrist, he came across as angry and prone to rage and social withdrawal and had lost 60% of his ability to function. (R. 23). The ALJ then noted that Mr. Allen attempted suicide – again – shortly thereafter with pills and alcohol and he was angry, frustrated, and depressed. (R. 23). His GAF score was just 48. (R. 23). Things were dire, but then the ALJ came to the evidence from March 2004:

> According to his therapist, he has been compliant with treatment and her notes from the session on March 3, 2004 include the fact that he was managing his emotions better.

(R. 23). Also, the ALJ points out that treatment notes from April 5, 2004, characterized Mr. Allen as mildly depressed, and the therapist did not discourage him when he expressed a desire to work. (R. 23). That is it for the ALJ's discussion of the date when Mr. Allen went from presumptively disabled under the Listings, to able to perform simple, sedentary work on a daily basis.

The flaw in reliance on selected progress notes has been addressed in two recent Seventh Circuit opinions. In *Kangail v. Barnhart*, 454 F.3d 627 (7th Cir. 2006), the claimant, coincidentally, suffered from bipolar disorder and was a substance abuser. Judge Posner took issue with the ALJ's focus on what the claimant's therapists had jotted down during her

19

sessions:

> He thought the medical witnesses had contradicted themselves when they said the plaintiff's mental illness was severe yet observed that she was behaving pretty normally during her office visits. There was no contradiction; bipolar disorder is episodic.

454 F.3d at 629. The Commissioner's own regulations acknowledge the cyclical nature of

such impairments. In the case of mental disorders, the regulations state a clear preference

for "longitudinal evidence":

> Your level of functioning may vary considerably over time. The level of your functioning at a specific time may seem relatively adequate or, conversely, rather poor. Proper evaluation of your impairment(s) must take into account any variations in the level of your functioning in arriving at a determination of severity over time.

20 C.F.R. Pt. 404, Subpt. P, App. 1, §12.00(D)(2).

More recently, in another case involving a bipolar claimant, Judge Posner had this

to say about exaggerated reliance on isolated comments in treatment notes:

> What seems to have made the biggest impression on the administrative law judge, but suggests a lack of understanding of bipolar disorder, was that [the treating psychiatrist's] treatment notes, which back up the report in which she concludes that the plaintiff cannot work full time, contain a number of hopeful remarks. They are either remarks the plaintiff made to [the doctor] during office visits or [the doctor's] independent observations – the plaintiff's memory was "ok," her sleep fair, she was doing "fairly well," her "reported level of function was found to have improved," she had "a brighter affect and increased energy," she "was doing quite well." On the basis of such remarks the administrative law judge concluded: "little weight is given the assessment of [the treating psychiatrist]."

*Bauer v. Astrue*, 532 F.3d 606, 609 (7th Cir. 2008).

Judge Posner explained that when a person with a chronic disease like a bipolar

disorder is under continuous treatment with heavy drugs, they are likely to have better days

and worse days. That is the nature of a chronic disease, whether it be physical or

psychological.[3] But intermittent periods of remission or amelioration do not warrant the conclusion that a person with a bipolar disorder can hold down a full-time job. *Bauer*, 532 F.3d at 609.[4] Certainly Mr. Allen has a chronic disease – the ALJ concluded as much -- and Dr. Schiff, the medical expert, allowed that Mr. Allen was "on a rather good dose of mood stabilizer." (R. 622). Like the claimant in *Bauer*, then, Mr. Allen ca be expected to have days where he is managing better or feeling less depressed than he is on other days.

It is for this reason that isolated comments by a doctor noting that a patient was doing better are not decisive and cannot be taken out of context, but must be viewed within the context of the whole treatment record. *Cf. Domingue v. Barnhart*, 388 F.3d 462, 463 (5th Cir. 2004)(isolated comments that patient might have problems with mental functioning not sufficient to raise suspicion that he did, when considered in context). Yet that is what the ALJ did in this case. The ALJ was impressed with a progress note from March 3, 2004, that Mr. Allen was "managing his emotions more effectively than in the past. He has been managing anger better than in the past." (R. 396). Better is a comparative term and so the question must be asked, better than what. Mr. Allen had just attempted suicide a little more than four months earlier. He was charged with domestic abuse just prior to that.

And while Mr. Allen's therapist may have not dissuaded him when he expressed a

---

[3] "Several multinational expert guidelines on the management of depressive disorders emphasize remission--an outcome that transcends response--as an achievable and more clinically relevant symptomatic end point. Residual depressive symptoms and incomplete remission are associated with early relapse, shorter duration between depressive episodes, chronicity and poor prognosis of comorbid medical disorders, increased use of medical services, and sustained elevation of suicide risk, as well as psychosocial and functional deficits." Roger S. McIntyre, MD, Joanna K. Soczynska, and Jakub Konarski, *Bipolar Disorder: Defining Remission and Selecting Treatment*, Psychiatric Times, Oct. 1, 2006, Vol. 23 No. 11, available on
http://www.psychiatrictimes.com/display/article/10168/52016

desire to return to work[5], Mr. Allen was dealing with the challenge of getting out of bed during the day at the time. (R. 393, 534). Also following the March 3rd session, Mr. Allen continued to have problems with anger management and dealing with stress. (R. 532-33, 428). After a session on July 19th, Dr. Kravets reported that Mr. Allen had difficulty concentrating, attending to tasks, staying on a schedule, getting along with others, and dealing with stress. (R. 428).

As in *Kangail* and *Bauer*, the ALJ put too much stock in an isolated comment in a progress note of a patient with a chronic disease.

Even from a general perspective and ignoring the nature of the malady, long before *Kangail* and *Bauer*, it was well-settled that an ALJ could not pick and choose among the evidence, selecting only those pieces that favor his ultimate conclusion. *Garfield v. Schweiker*, 732 F.2d 605, 610 (7th Cir.1984); *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994). The ALJ did that here in order to select the date that Mr. Allen went from presumptively disabled under the listings to able to hold down a full-time job. Those notes do not provide substantial evidence to support such a conclusion.

### 2.

Isolated comments in progress notes were also the basis for the ALJ's complete rejection of Dr. Kravets's opinion that Mr. Allen was disabled. A treating physician's opinion is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" in the record. 20 C.F.R. § 404.1527(d)(2); *Schmidt*, 496 F.3d at 842;

---

[5] The ALJ states that this progress note is dated April 4, 2004. But the progress notes from that day do not mention a return to work. (R. 394, 411).

22

*White v. Barnhart*, 415 F.3d 654, 658 (7th Cir.2005). This rule takes into account the treating physician's advantage in having personally examined the claimant and developed a rapport, while controlling for the biases that a treating physician may develop, such as friendship with the patient. *Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006); *Dixon*, 270 F.3d at 1177. The Seventh Circuit has expressed some puzzlement about the rule:

> Obviously if [the treating physician's medical opinion] is well supported and there is no contradictory evidence, there is no basis on which the administrative law judge, who is not a physician, could refuse to accept it. Equally obviously, once well-supported contradicting evidence is introduced, the treating physician's evidence is no longer entitled to controlling weight.

*Hofslien*, 439 F.3d at 376. At that point, "the treating physician's evidence is just one more piece of evidence for the administrative law judge to weigh." *Id.* at 377. In deciding how much weight to accord a treating physician's opinion, the ALJ should consider various factors, like how often the treating physician has examined the claimant, whether the physician is a specialist in the condition claimed to be disabling, and so forth; consistency with the record and support are rolled back into the equation as well. *Id.* at 377; 20 C.F.R. § 404.1527(d).

Here, the ALJ said Dr. Kravets's opinion was "so far from the truth" that it merited "no evidentiary weight whatsoever." (R. 26). In reaching this assessment, the ALJ was most concerned with various treatment notes that indicated that Mr. Allen was only "mildly" depressed – from Dr. Kravets himself – or managing his emotions better or feeling better – from Mr. Allen's therapist. In a case dealing with a diagnosed bipolar disorder at least, such "hopeful" comments -- when they set off by other, more pessimistic assessments – do not provide an adequate basis for rejecting a treating psychiatrist's opinion. *Bauer*, 532 F.3d at 609; *see also Kangail*, 454 F.3d at 629.

23

In *Holohan v. Massanari*, 246 F.3d 1195 (9th Cir. 2001), the plaintiff argued that the ALJ improperly rejected a doctor's opinion concerning the scope of her limitations. The court concluded that the argument was meritorious. As plaintiff pointed out, the ALJ was selective in his reliance on the doctor's treatment notes, which were exaggerated in the ALJ's description of their contents. Although the doctor made "hopeful comments" about plaintiff attending classes, he also listed as plaintiff's symptoms, "demoralization, feeling trapp[ed] ... anxiety ... depressed mood." The doctor never described a great improvement in plaintiff's condition as the ALJ suggested.

While the doctor did state on November 8, 1996, that plaintiff was "doing better," he explained that this meant fewer panic attacks unless he was inactive in which case the attacks increased. The Ninth Circuit stressed that the doctor's statements must be read in context of the overall diagnostic picture. That a person who suffers from severe panic attacks, anxiety, and depression makes some improvement does not mean that the person's impairments no longer seriously affect her ability to function in a workplace. *See also Kellough v. Heckler*, 785 F.2d 1147, 1153 (4th Cir.1986) ("Feels well" and "normal activity" must be read in context); *Krizon v. Barnhart*, 197 F.Supp.2d 279, 289 (W.D.Pa. 2002)(hopeful comments by physician about plaintiff's future abilities cannot be read as an indication of plaintiff's actual capacity).

To be sure, the ALJ also mentioned two other reasons he found Dr. Kravets's opinion unworthy of any evidentiary weight. But one reason was the testimony of the medical expert, who focused on the same thing the ALJ did: a couple of isolated comments in progress notes. (R. 26). Basically, Dr. Schiff was troubled by the juxtaposition of Dr. Kravets's rather dire assessments of Mr. Allen's ability to function – including a GAF score

24

of 48 on October 27, 2003, and the opinions that he was essentially disabled on July 19 and 27, 2004 – with his comments that Mr. Allen was mildly depressed on February 2, and April 5, 2004. (R. 598). Dr. Schiff was also impressed with the fact that Mr. Allen's therapist did not shoot him down when he said he hoped to return to the workforce. (R. 621). The therapist merely noted that she highlighted and encouraged such a positive step. (R. 393). It is a bit of a stretch to equate this with an opinion that Mr. Allen was capable of working five days a week at that time. And it is not surprising that the therapist did not quash Mr. Allen's hopes, even if she knew he was not ready for the workforce.

Again, perhaps Mr. Allen *was* mildly depressed on those days or hopeful about changing his life. The longitudinal picture is different. The psychiatrist who examined him for the Agency in February 2003 said he was seriously ill, with a guarded prognosis and a 60% reduction in his ability to function. Mr. Allen attempted suicide in October 2003. Dr. Kravets, who treated him following his hospitalization, found him seriously impaired and essentially unable to function in a work setting at the beginning of his treatment and again in July of 2004. He prescribed what Dr. Schiff called "a rather good dose of Depakote" – along with three other medications – twice the level Mr. Allen was on during the period the ALJ found him disabled. (R. 364, 369, 370, 373-376, 383-84, 428).

In addition, it can be said that as a whole, Dr. Schiff's testimony was somewhat inconclusive. He did question the opinion of Dr. Kravets because of the two or three positive treatment notes, and he professed not to understand what Dr. Frey meant by saying Mr. Allen's functioning was reduced by 60%, although it seems self-evident. Yet, after observing Mr. Allen and listening to his testimony, Dr. Schiff was impressed with how withdrawn Mr. Allen was, which, along with the lack of energy and motivation Mr. Allen

25

described, were symptoms that could be expected from severe depression. Dr. Schiff may have thought Mr. Allen's complaints were inconsistent with the isolated comments in the treatment notes, but they were certainly consistent with the pessimistic assessments of Drs. Frey and Kravets. So maybe Mr. Allen's psychological impairment was disabling, maybe not. Overall, Dr. Schiff's testimony was inconclusive; not a proper basis to reject a treating psychiatrist's opinion that is consistent with that of the consultative examining psychiatrist and consistent with the claimant's subjective symptoms. *See Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003).

Dr. Schiff also suggested that the diagnosis of bipolar disorder – one that was consistent from any number of examining sources, through hospitalizations and treatment from 1999 onward – was wrong. Mr. Allen was just depressed due to conflicts in his personal life. The ALJ also pointed to this in his rejection of Dr. Kravets's opinion. (R. 26). But a bit more support for such an opinion would be needed before one could toss out an entire medical history. *See Gudgel*, 345 F.3d at 470. Dr. Schiff also seemed to attribute Mr. Allen's bipolar disorder to his substance abuse; an opinion shared by Dr. Boyenga, the Agency Ph.D that reviewed Mr. Allen's file. That would fly in the face of current medical literature. *Kangail*, 454 F.3d at 629.

Finally, the ALJ also referred to Mr. Allen's brief stint as a mover as a reason for ignoring Dr. Kravets's opinion that Mr. Allen could not work:

> . . . the evidence is substantial that the claimant's recent entry into the job market ended not because of mental or emotional difficulties, but because he couldn't do the heavy physical work that working for a moving company required.

(R. 26). The ALJ does not indicate what this "substantial evidence" might be. From the

ALJ's survey of the evidence, one suspects it might be Mr. Allen's own testimony. (R. 25). When the ALJ asked Mr. Allen why he could not return to his moving job, he said it was partially because of his physical problems, but also because of his psychological problems. Mr. Allen explained he was just not "function[ing] right:

> It's like when I did work before, you know, I was working and I be somewhere else. I be working on the assembly line and I am just there and product would just back up on me because I am somewhere else. I drift off at times.

(R. 617). Also, because of his psychological impairment, there were days that he was not able to make it into work when the moving company called him. (R. 619). The ALJ focused on one reason and ignored the other, again selecting only statements that supported his ultimate conclusion while disregarding those that did not. So this is not substantial evidence that Mr. Allen's only problems are physical, and not much of a basis to reject Dr. Kravets's assessment of Mr. Allen's psychological impairment on his ability to work.

### 3.

Of course, the ALJ said he did not believe Mr. Allen's allegations regarding the limitations stemming from his psychological impairment; although from the above, he apparently accepted his testimony as to his physical condition. The ALJ does not really explain why that facet of Mr. Allen's testimony was believable[6] but he does say why he did

---

[6] A fact-finder may believe some portions of a witness's testimony, while rejecting others, but ought to explain reasons for both determinations. *See Sears, Roebuck & Co. v. N.L.R.B.*, 349 F.3d 493, 514 (7th Cir 2003); *J.C. Penney Co., Inc. v. N.L.R.B.*, 123 F.3d 988, 995 n.1 (7th Cir. 1997). What a fact-finder cannot do is say I don't believe X because of other evidence, but I do believe Y because it serves my purpose. Here the ALJ went over the evidence relating to Mr. Allen's psychological impairment, but did not discuss any evidence relating to his physical limitations aside from Mr. Allen's testimony. (R. 22-25). Indeed, although the ALJ finds Mr. Allen limited to sedentary work, his decision does not really include a finding that he has a severe physical impairment; at least not as clear a finding as the ALJ made regarding Mr. Allen's bipolar disorder and substance abuse (continued...)

27

not believe Mr. Allen's psychological symptoms. But his reasons are those that have already been called into question: two or three positive progress notes, and Mr. Allen's "testimony" that only his physical problems prevented him from being a mover. Beyond that, the ALJ merely says he considered the factors he is required to by Social Security Ruling 96-7p. That is not sufficient. *Arnold v. Barnhart*, 473 F.3d 816, 82223 (7th Cir. 2007); *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir.2001); *but see Schmidt v. Astrue*, 496 F.3d 833, 843 (7th Cir. 2007)(ALJ stating that he considered claimant's testimony and record under SSR 96-7p is sufficient).

Some of those factors might have been telling, had the ALJ discussed them. *See* SSR 96-7p; 20 C.F.R. § 416.929(c)(3); *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000). The medical expert – whose testimony the ALJ relied upon – said that the symptoms Mr. Allen alleged were consistent with what might be expected from an individual suffering from depression. He also said they might be expected as side effects from the medication – a significant amount – that Mr. Allen was taking. And certainly, Mr. Allen testified that his daily activities were severely curtailed.

In the end, then, the ALJ's decision relies far too heavily on two or three treatment notes contrasted against an entire record. Those notes also form the basis of the medical expert testimony on which he relies. The longitudinal medical record demonstrates the Mr. Allen suffers from a chronic, and episodic, mental illness. The healthcare professionals who

---

[6](...continued)
disorder. But without Mr. Allen's physical limitations, the ALJ would lose one of the bases he cited for rejecting both the opinion of Dr. Kravets and Mr. Allen's description of his psychological symptoms.

have examined him have indicated that he is disabled.  That he might have a good day here and there is not enough to discount the balance of the record.

## CONCLUSION

The plaintiff's motion for summary judgment or remand is GRANTED, and the Commissioner's motion for summary judgment is DENIED.

ENTERED: _____

UNITED STATES MAGISTRATE JUDGE

**DATE:** 10/8/08